4 argued cases today, and the first of them is number 2012-12-98, ORGANIC SEED v. MONSANTO. Mr. Ravitcher, is that the way you pronounce it? Yes, Your Honor. Thank you, and may it please the Court. This case boils down to a simple question. If plaintiffs don't have standing now, when will they? Do they have to wait to be contaminated by defendant's seed and be exposed to liability risk? Do they have to wait until Monsanto directly threatens them, even though Monsanto has threatened other people who have been contaminated? How about actually making a determination of which patent is involved in the seed that's likely to blow from the neighbor's field? Well, we represent clients who are farmers from throughout the country and all different industries, cotton, canola, soy, sugar beet. We merely identified the patents that we believe we have a Rule 11 basis Monsanto could accuse them of infringing, namely the patents that they list on their own bags and in their own licensing agreements when they sell their seed to their customers. So that's where we got the identification of patents. If there's any individual patents that they want to covenant not to sue us so we can help purge this case down to a more manageable size, we're happy to let them do that. But I don't see any allegation that there's a specific field, adjacent field, which is growing cotton crops covered by a particular patent that might blow onto one of the plaintiff's fields. It seems to me that that specificity is missing both in the complaint and in the various declarations. Well, I think when we take into account the facts that are alleged, which is that Monsanto's seed has over 90% market share in these affected crops. They've been very successful licensing their crops. And when it comes to organic farmers or simply non-GMO farmers, that they're surrounded now by defendant's product, it's reasonable to assume that our allegations are true, that they will be contaminated, which is something even district courts said is inevitable, and that that contamination will come from Monsanto's seed. But doesn't Monsanto have an express policy that they won't pursue people who have de minimis amounts of seed inadvertently, like in this situation? Well, I don't know if you can have an express policy anonymously. That's not signed. It's not enforceable. It's revocable at will. And we have actual evidence in our case that we reference where they have actually. Whether it's revocable or not, you have to prove that there's an actual controversy here. And the fact that they have the only evidence of record is we're not planning on suing people like you, and we've never sued people like you. Why doesn't that show the absence of that actual controversy? Well, I would say we nearly need to prove that our uncontroverted allegations prove that there is a controversy, not that the facts necessarily say that there is one. And our allegations include the allegations that Monsanto made against the Runyons, which has been well documented. It was publicized on national media where the Runyons were accused of patent infringement by Monsanto. Monsanto's representative was included in that CBS Evening News story and did not deny the truth of what the Runyons were saying. And there's also the case that we allege in our complaint about the Nelsons and Rausch and other farmers who, despite their expressed policy on an anonymous website statement, they've gone after because they were contaminated. Why wouldn't the representations that they've made here to try to get us to hold lack of jurisdiction, why wouldn't those be binding as judicial admissions? I think they would have a Rule 11 basis that they aren't equitably stopped from changing their mind tomorrow and suing our clients. Now, this court wants to hold that what they've done so far forecloses them from ever suing my clients for patent infringement. I will accept that decision of the court and agree with you there's no jurisdiction, but I don't think what they've said provides my clients the insurance policy that they're looking for. You know, the declaratory judgment was created. We're a court. It's not our job to issue insurance policies, and nor does Monsanto have to do that, and nor would they have to, it seems to me, promise they're never going to sue you in any circumstance. For example, suppose you actually start using their seed, intentionally using their seed. I mean, to say that they need to right now promise never to sue you ever, nuh-uh, no matter what, seems a bit outrageous as a standard to apply. We've never proposed that, Your Honor. I would agree that's… I would never sue my client no matter what. No, I believe I heard your question, which was, why do they have to promise to never sue our clients if our clients change the representation that they're making about their intentions? My clients don't want a covenant not to sue, which allows them to change their intentions. The covenant not to sue can be limited, just like the already-de-Nike covenant was limited to only colorable limitations, not knockoffs. Our clients merely want a covenant not to sue that says, so long as you don't intend to possess Monsanto's seed, we won't sue you. Now, if you violate that condition precedent, the covenant not to sue explodes, and we can come after you, and my clients have no problem with Monsanto going after you. So long as you don't intend to, but lo and behold, it turns out that an analysis of your crops over time is 50% of the seeds you're planting is their seed. So would we have standing then if we have been contaminated? Is that sufficient? Now we've been contaminated. Now we're exposed. Have they created a controversy? Is there any evidence that they've sued someone in that situation? Is there any evidence they've even threatened anyone in that situation? Yes, Your Honor. We include that in our complaint, which the district court ignored. I mean, the Runyons are a perfect example of people who were contaminated and accused of patent infringement by Monsanto. Monsanto's representative was included in that story, did not deny the allegations, and merely said, well, we have a policy not to do it. Well, your policy is not more binding than what you actually did. And just put yourself for just 30 seconds in Chuck Noble's shoes or Fedco's shoes. You're a farmer. You're not a lawyer. You're not an expert in patents. You don't know anything about patents. You're just trying to provide products to your customers. You know the well-documented history of Monsanto aggressively asserting its patents, yes, against most farmers who were intentionally using their seeds, but also against some farmers who were contaminated. What would you do? It's reasonable for you to then say, well, I have to adopt expensive genetic testing to make sure that I'm not contaminated. I have to stop growing. Well, I don't see that there's a clear example of a situation where they've sued somebody where there were trace amounts in the crops. There is the Schmitzy case in Canada on which you relied. But that seemed to be a situation in which, if I recall correctly, that 60 percent of the seed was contaminated. But what's the example where they sued based on trace amounts? Well, that's part of the problem here. We don't know when we've been contaminated by trace amounts. First of all, we don't know what the definition is. No, no, no. But what's the answer to my question? Is there an example of a suit that they brought based on contamination by trace amounts? We're not aware of them filing such a suit. But we don't believe that such a suit is required. It's just like the same reason you don't have to be at risk of being sued. That's the reasonable apprehension of a suit test. You have to be in fear of being sued today. That's not the immediacy that's required for an injury. The immediacy that's required for injury is that you're suffering some economic harm today. You're under an interim choice today. So, the standard is not you're suffering economic harm today or every patient who wants a BRCA test would have had standing in Marriott. So, that's absolutely not the law. Well, I would respectfully say that I know that you were on the panel, but I would interpret AMP differently. The panel was unanimous on the issue. Right. And your Honor as well. And I would say that the standing there was that although there was injury, what the AMP decision said was there was no causation. Not that there was no injury, but there was no causation. And I actually read AMP to say that the other plaintiffs did have injury. So, I prefer to do the standing analysis very structured. Element one, injury. Look at just the plaintiffs. Element two, causation. Look at just the defendants. Element three, readjustability. Look just at the court. Injury, AMP was found. That's how I read it. Causation was not found for anyone other than Dr. Oster because there had been a threat made against him directly. But in that situation, we didn't have the same evidence that we have here. And we believe causation is found here under different facts where they have accused others who were contaminated, where they have more than 90% market share, where our clients are differently situated. In that case, the clients, what's objectively reasonable to BRACA scientists and what's objectively reasonable to a farmer is different. What's reasonable for a farmer to feel about their liability? If I understand the complaint here and the declarations, there's no allegation of concern that there would be more than trace amounts of contamination. Is there? Am I missing something? No. The concern is that trace leads to more than trace. First of all, again, we don't know what trace amounts means. So, we don't know what that means. It could be the NOP standard. It could be 5%, 10%. We don't know. But beyond that, trace leads to more than trace. If you're a farmer and you're contaminated by this, you have no clue. Well, that's what you say. Where do I find that in the declarations of the complaint here? Well, in the declarations, if you look at, for example, the declaration of Don Patterson in the record at A718, you would see in paragraph 3 on page 2, if I were to try to grow organic alfalfa… What page are you at? Oh, I'm sorry, Your Honor. The specific page, pin site, is A719. Okay, and in paragraph 3, if I were to try to grow organic alfalfa, which is one of the crops they have genetically modified seed over, I would be at risk of being accused of patent infringement by Monsanto and my crop would become contaminated. There's no limitation that says I would only be trace contaminated. He would be contaminated. There's also no allegation that it would be contaminated in a substantial amount either. Well, I think he talks about, if you read in paragraph 2 on the same page, I would like to be able to grow organic alfalfa now, but if I were to try to grow it in the current environment, it will likely only be a limited number of years before all alfalfa everywhere in the nation and neighboring nations is contaminated. We saw this with Liberty Link, which we discussed in our complaint, where they were only doing a trial of Liberty Link rice. Just a trial. It wasn't even in consumer availability, and it contaminated vast stocks of other rice farmers' fields. So, you know, if the precise wording in our declaration is not exactly what you're looking for, that's because these are legitimate declarations written by real farmers. You know, these are people who are really effective. They're not lawyers. They don't know exactly the right word to write, and trace is their word. Monsanto's word, not ours. And there's no rule that says because we're contaminated, only trace amounts. They couldn't sue us. If we have one seed, one seed, they could sue us, and they haven't waived their right to do that. So, again, like I said, what else needs to happen here for us to have standing? I see I'm well into my rebuttal time. Unless you have other questions, I'll stand down further. Okay.  Thank you. Mr. Waxman? May it please the Court. The Supreme Court reaffirmed in Metamune that any declaratory judgment action has to involve two parties that are in substantial controversy that is both real and immediate, not one of those three requisites that's met here. The plaintiffs have alleged that they have no transgenic materials. They have never been contacted by Monsanto. They oppose transgenic materials on principle, and they avoid having any contact with them. The first of the allegations here were that there was a neighboring field that's growing corn that's covered by a particular Monsanto path, and that that corn is blowing onto their fields and causing contamination, and that within three years' time, let's say, that 50 percent of their corn seed will be contaminated and bear the genetic hallmarks that would bring it within the patent. Would that be sufficient for standing? It would certainly not, and we have nothing remotely like that here, as I think your Honor's question intimates. But in that instance, one needs to focus on what the substantial legal dispute here is between the adverse parties. This isn't a case about, I don't know, trespass or something like that. This is a dispute about patent infringement. So why wouldn't they have standing in that circumstance? Because they would have to show under MedImmune that there is a substantial, real, and immediate risk, real risk of enforcement action by Monsanto in a context. Counsel, your policy, as I understand it, is as long as you have a de minimis amount, we're not going to go after you. Inadvertent de minimis amount. Under Judge Dyke's hypothetical, it would no longer be de minimis. It would be 50 percent. Why doesn't that give them the standing? Given you've set a policy that says we won't go after these types of people, once you're clearly not within that umbrella, why doesn't that create a very real… Because, Judge Moore, it's the plaintiff's burden, and the plaintiffs have to show… Monsanto is incredibly litigious with regard to these patents. That's not correct. There are, as the district court found as a matter of fact, over the 13 years at the time of trial that these products had been on the market, there had been 144 lawsuits filed. The court also found as fact… Okay, wait. So, 144 lawsuits on 13 patents. So, you're talking about 10 lawsuits per patent. Let's see. How many patents a year are granted, Mr. Waxman? I don't know, but in fact… How many patents a year? You have no idea? I have no idea how many patents are granted, and not only that… Okay, let's say 200,000 a year. How many lawsuits are filed every year? I don't know. Okay, but roughly, let's say 5,000, 4,000, 2,000, something like that? How many lawsuits per patent does that equate to? I don't know, but I… I think 10 lawsuits per patent is pretty litigious. Your Honor, there are, as the court found, there are more than 2 million farms in the United States, and as they allege, there are something like 90% of the farms that grow Monsanto Roundup Ready crops have in fact licensed them. What they have to demonstrate is, in the absence of… I mean, Monsanto has stated, and they don't dispute, that Monsanto had not heard of one of these 300,000 farmers or 4,500 farms before they filed the lawsuit. They filed a lawsuit that said, we just want to be left alone. We have said, we want to leave you alone. What about the hypothetical where there's 50% contamination and they continue to… They don't license… They've never licensed the patent, but it blows onto their field, and within three years, 50% contamination. They keep planning it. Is that a situation in which Monsanto has said it won't sue? Monsanto has said that they have alleged that they have no intention of making use of it, and they don't want to make use of it. Monsanto has said, as the district… In my hypothetical, has Monsanto said that it won't sue? Monsanto has said that it has never sued any farmer that did not wish to take affirmative advantage of its patented technology. It has told the plaintiffs in this case… Because it's not an answer to my question about the hypothetical. Would it sue in the hypothetical I gave you? Well, all I can tell you… The answer is no, and the reason is that Monsanto has said in response to their letter that, assuming the representations of their complaint are true, which is that they have no intention of making use of Monsanto's technology, they have nothing to fear, and any fear that they have of patent infringement litigation is baseless. And among other things, that is because, as the district court found as a matter of fact, reviewable for clear error, there is no instance in which Monsanto has ever brought a lawsuit against any farmer who was not making deliberate use of the technology without paying the license fee, period. And in the absence of any contact by Monsanto against any of these plaintiffs, and the absence of any demonstration of any lawsuit in which there was anything less than an allegation of deliberate infringement, there is no basis to conclude under Metamune that there is a substantial patent law controversy that is both real and immediate, period. Does your representations here about what Monsanto will do in the nature of bringing a suit binding if you win this case as a judicial estoppel? If the court writes an opinion that relies on the representations that I made in my letter in response to their letter, then I think it would be binding as a matter of judicial estoppel. They haven't established, as the district court found, their complaint and their amended complaint does not establish a substantial real and immediate Article III controversy independent of the exchange of letters. Mr. Waxman, would you address, a person counsel cited the Runyon's case a couple of times. Would you address why you think that isn't a case against similarly situated farmers? Sure. First of all, there was never any case. The Runyons were not sued. They are relying on some CBS article in which the Runyons said that Monsanto had come to them and said, we have reason to believe that you are saving Roundup Ready C without paying us the technology fee, and we would like to see your records. The Runyons denied it, refused to give them the records, and no lawsuit was ever filed. Even if there were an instance, and one would think that if Monsanto had a widespread policy of somehow counterintuitively enforcing its patents against people who had no desire whatsoever to make use of its technology, that these 304,500 plaintiffs would be able to come up with evidence of, in fact, that widespread rabid enforcement policy. Even if Monsanto had sued the Runyons and said, we know you're not trying to use this, but we've just decided to sue you for patent infringement, which is a strict liability tort, that wouldn't demonstrate in the absence of any communication from Monsanto to any of these 304,000 entities or anyone other than the Runyons in that counterfactual hypothetical that Monsanto had such a widespread policy of enforcement against inadvertent infringers that there was a real, immediate, and substantial threat of enforcement action by Monsanto, period. I mean, this is a case in which they have filed a lawsuit saying, we just want to be left alone by Monsanto. Monsanto has said, we just want to leave you alone. We've never heard of you people. And if the allegations of your complaint are true, you have nothing to fear from us. And yet we can't seem to be left alone by this group of people who, although they have no intention or desire ever to make use of transgenic technology, want 600 claims in 23 patents to be declared invalid under every possible ground, unenforceable, not infringed. I mean, the ludicrously of them bringing up complaints saying, every one of these claims, we don't want to use this technology, but every one of these claims fails the best mode requirement of the patent law, demonstrates just how far this is from a lawsuit. This is not an Article III case or controversy. This is a dispute about the viability and wisdom of permitting transgenic agriculture, and federal courts are not forums to adjudicate that policy. Could I return to Judge Dyke's hypothetical for a moment, which, if I recall it correctly, was the case of the non-intending, we'll use that term, infringer, who nonetheless has fined himself with 50 percent of his crop that's been affected by the transgenic seeds. Is your policy based entirely on intent, or is it a combination of intent plus trace or other form of minimal effect, a minimal concentration of your genes? I mean, the difficulty I'm going to have in answering your question is identifying the policy. That's why I asked, actually, because I'm unclear as to what exactly the policy is, so the best you can do by way of explaining whether Monsanto's policy is based on one of those factors or both. Monsanto's, the statement on its website is based on both, and the reason that it is, as Mr. Ravitcher points out, that statement is not an enforceable commitment. But it is an attempt to assure farmers that if they don't intend to use Monsanto's, take advantage of the patented technology, they're not going to be sued. The reason it doesn't have only one rather than the other is, you know, intent can always be disputed, and Monsanto shouldn't be- That's one of the things that troubles Mr. Ravitcher. Well, I mean, for example, his case in point is the Percy Schmeiser case, in which Mr. Schmeiser, as Judge Dyke pointed out, said, well, I tested some of my field, and it had 60 percent, but I didn't mean to do it. Monsanto brought suit because, as the Canadian courts found as fact, the next year after he tested, all 1,000 acres of his fields tested between 95 and 98 percent positive for Roundup Ready, which the court found was inconsistent with any policy of inadvertence. The reason that- Suppose, though, what happened is that the farmer said, look, and under the Smith-Klein case, as I understand it, that windblown seed does create an infringement. So the farmer says, look, I don't care whether the thing belonging onto my land is covered by a patent or not. I'm just going to continue to harvest my crop and use the seed, and if it turns out that 60 percent of it is Monsanto patent covered, I don't care. I'm going to continue to plant it, and it ends up that 60 percent of the seed or 90 percent of the seed is contaminated. Will you sue somebody under those circumstances? Well, it's their burden to demonstrate that we are so likely to do so. No, no, but what's the answer? Will Monsanto sue under those circumstances? Monsanto has said that it has no intention of bringing enforcement litigation against farmers that don't wish to take advantage of its patented technology. There's a vagueness about that. Does that mean if the guy says, I don't care which kind of seed it is, I'm just going to keep replanting it. I know that some of this is transgenic seed, but so what? Does that satisfy the intent requirement? The intent requirement of what? On top of the representation that you've made, would Monsanto sue under those circumstances? Monsanto has said in this case, and we are very far afield from this case, that based on Mr. Ravitcher's written representations, it has no intention to and will not sue these plaintiffs based on their representation. Wait, you're not addressing the hypothetical. The person knows that the seed is covered by the patent. He knows that his crop has become contaminated. He says, look, there's nothing I can do about it. I'm not going to go to the expense of separating out the patent seed from the other seed. I'm just going to keep planting, and I never bought any of this stuff, and I don't care whether it's transgenic seed or regular seed. I'm just going to keep doing it. Is that a situation in which Monsanto would sue or not? That is exactly what Percy Schmeiser said, and when Monsanto sued, it was revealed that the very next year, 98 percent of his thousand acres had Roundup Ready seed. That's why I cannot give your honor a covenant that any time a farmer says, well, I have a ton of it, but I'm not making any use of it, and I don't want it, Monsanto would forswear ever bringing a suit, but this is a real lawsuit. This is a real case, and these people have said, we don't have any of this. We don't want it, and we don't like your technology, and Monsanto has said, and number one, the district court has found as fact that Monsanto has never brought a lawsuit in circumstances remotely like this, and Monsanto has gone further to say, if your representations are true, we have no intention of suing you. Why would a company whose sole customer base is farmers want to make a practice of trying to sue whatever it is, 95 to 98 percent of the farmers, and how could it, if Monsanto doesn't know that whatever it is, 20 percent, 30 percent, 15 percent, 60 percent of the field is Roundup Ready, how could the farmer ever have a real, substantial, objective concern about imminent patent infringement litigation? I mean, it just doesn't make sense. We don't have an obligation to give a covenant absent a showing of a controversy between two parties. You've explained in the context of the Schmeisser case, Monsanto reached a conclusion that the Schmeissers were not candid about their intent, whatever, in effect, based on the percentages in the field and so forth. What is the question, under Monsanto's policy, what is the question exactly that Monsanto would ask in a situation such as Judge Dyke's hypothetical, in which there's a substantial percentage of the transgenic gene, but nonetheless, the farmer is saying, I have no interest in or desire to utilize this technology. It just happens to be in my field. What is the exact question that Monsanto would ask in deciding whether to go that this is a Schmeisser type farmer versus a farmer that they're not interested in doing? But is spraying his fields with Roundup on top, and the plants are surviving. I mean, this is pretty straightforward. Monsanto, if the farmer were not, in the Roundup Ready case, if the farmer were not spraying glyphosate over the top of his field, by definition, he wouldn't be taking advantage of Monsanto's technology. And Monsanto wouldn't even know that there was, quote, contamination, if there was any contamination. I mean, this is an imagined, to the extent that there really is a fear by any of the plaintiffs, and as the district judge found as fact, there is no objective basis for concern by any of these people that Monsanto is going to sue them, in the absence of, at a minimum. I mean, she said, you know, I've read the Federal Circuit cases that say that, at a minimum, the patentee has to take some directed action against the declaratory judgment plaintiff. But even if that weren't the case, the plaintiff, in order to establish an Article III case or controversy, has to come up with real facts, showing that there is a real and imminent fear of threatened patent enforcement. No, of course not. Now, there are conventional farmers in this case as well. But there is no evidence whatsoever that Monsanto has ever sued a conventional farmer that wasn't deliberately taking advantage of his technology. So, would it be fair to say, in my hypothetical, that Monsanto would not sue unless the farmer was using Roundup on his crops? It's never – so far as – I don't know whether it would be fair to say, because I'm not at Monsanto. I'm not investigating all of these allegations. I can tell you, as I represented below, and as the decided cases, the publicly filed complaints in all 144 of these cases reveal, that these were, in Monsanto's views, and to the extent that these cases have gone to judgment, all of the courts have agreed, cases of deliberate use of Monsanto's patented technology without paying a license fee. So, do you – since you focus so heavily on deliberate, do you agree, then, there really is no obligation on the part of the organic farm growers and the conventional farmers who are not deliberately using it to affirmatively test to ensure that they don't have a high concentration of transgenic seed? I mean – Because if they're not deliberately using it, then they shouldn't be burdened with the expense of this testing, right? Well, I mean, if you look – the two affidavits that talk about testing were instances in which you have a – the Fedco case was a seed dealer that sells only – it doesn't farm. It sells only organic and conventional seed. It warrants that the seed that it is selling to farmers is not transgenic, and it tests in order to safeguard its business model. It's not testing because it's afraid that – it would be happy never to test. It just doesn't want to be sued by Monsanto. And likewise, the farmer affidavit who said that he tested says that he has a fundamental objection to the use of transgenic material, and there's no allegation in there, nor would there – nor would one be objectively justifiable that the only reason he's testing is so that Monsanto won't immediately threaten enforcement action against him. I mean, in MedImmune, this court made – the Supreme Court made clear that the test here, whether it's a question of public enforcement or private patent enforcement, is whether there is threatened enforcement activity. That's the exact words of the Supreme Court in saying that there isn't a difference – the standing test isn't different between threatened public enforcement activity and threatened private enforcement activity. It is their burden to show that there is threatened enforcement activity against them based on the facts of what they do, and they haven't shown a threat, they haven't shown enforcement, and they haven't shown any activity with respect to them or with respect to individuals or farms that are similarly situated. And that is dispositive of the Article III question in this case. I see that my extra time has almost expired, so thank you. Thank you, Your Honor. What I hear Mr. Waxman arguing is that we should go back to the reasonable apprehension of suit test, that if you're not under a direct threat of being sued today, you have no standing, and we know that's not correct. This court's cases, Sandisk, Sony, ABB, all say there needs to be no direct threat. Even Eris says there needs to be no direct contact. Even going back to the days of the reasonable apprehension of suit test in Arrowhead, there doesn't need to be any direct contact. But his argument is no similarly situated person has ever been sued. So I don't think that he's arguing no contact. I think that he's arguing no basis. So whether or not you have to be sued or threatened in order to have standing, I would say doesn't make a distinction. Whether you've been threatened or sued can have the same effect. Also, I would say if the court is so inclined to do here what it did in Prasco, which is take our amended complaint that was filed under Rule 15a.1 and transfer it into a supplemental complaint under 15d, you can then add in all of the letters that we wrote back and forth. So his statement that they never heard of us before is no longer applicable once you take into account our amended complaint. If you're not willing to do that, then depending upon how you – I'm sorry, flesh that out a little bit more for me because I'm not sure I understood what you're saying about the amended complaint. Absolutely, Your Honor. So we filed the amended complaint within a certain number of days of serving, which we're allowed to do. But if you were to read the precedent, as I do, which says you can't rely on those facts. I understand. But under Prasco, this court, where the complaint had been filed as an amended complaint – I understood this part. What I'm unclear about is how the additional material – with specificity, how does the additional material change this case? So what we add in the – if you were to call it a supplemental complaint, is the refusal to give a covenant not to suit, which this court has said in Prasco as well is informative. So that can help. I also – have I answered your question? Well, is that all that's in the supplemental materials? Well, there's also the statement, the vague statement they made on their website as well as after we filed the suit. All right. I would just like to also follow up on the footnote that this court had about the difference perhaps between an invalidity and unenforceability DJ and a non-infringement DJ. And the intellectual property law professor, Zemecki Brief, I think tees that issue up quite well. There might be a difference for causation between an account for a DJ of invalidity or an account for a DJ of unenforceability versus a DJ of non-infringement, where more has to have materialized. There has to be more information. In that case, they were only seeking a DJ of non-infringement. And this court said that because the patent holder wasn't even aware of the DJ plaintiff's product, there couldn't have been a real controversy yet. How many plaintiffs are in your suit? How many plaintiffs? Well, how many appellants or how many plaintiffs? Appellants, we have, I believe, 74 specific appellants, but several of them, about three dozen, are agricultural organizations with several thousands of members that they're representing in the organizational standing capacity. So when Mr. Waxman said 300,000, that's not plaintiffs. That's people who are asking for the DJ action to move forward. Right. And one thing I heard very interesting that you teased out, and let me just say, your hypothetical is not hypothetical. It's real. We have clients not involved in this case who have been contaminated to an extent that we believe is beyond trace. What is the, since you make that representation, what's the highest number you have in terms of percentage? I would prefer not to reveal any attorney-client privilege, but I can say it's beyond trace amounts, a significant amount. Well, what do you call trace? You yourself said trace is indefinable, or at least in the eye of the beholder. So what are you calling trace for present purposes? Well, the best basis for trace amounts would be the NOP standard, the National Organic Program standards, which I believe set the level at 0.9%. So that's what a bunch of people who care about organic standards, and you can still stamp organic on your product, say you can have contamination up to that amount. So if we're going to ask other experts in the organic world what's a trace amount, what's not, I would say that's probably our best source. So you're saying that you have cases of your clients who are contaminated to an extent greater than 1%. Not in this case, no. But, yes, we do have clients. Right. And that's because – They're not here. Right. And I'm just letting – my only point to say that was not to influence your decision in this case. My only point was that it's not a hypothetical. It's reality for some people. And if there are no further questions, the last point I'd just like to say is my clients do really hope the court doesn't underestimate how much they appreciate your time and consideration. Thank you. The case is submitted. We thank both counsels.